State v. Ferguson.

# THE STATE OF NEVADA, RESPONDENT, v. OWEN FERGUSON, APPELLANT.

QUESTION OF JUSTIFIABLE HOMICIDE IN CASE OF COMBAT. In a murder case where the defense was justifiable homicide, and the testimony showed a quarrel and combat between defendant and deceased, the court, after charging in relation to the law of murder and manslaughter, added, "And to justify the homicide it must appear that there existed an unavoidable necessity, without any will or desire, or without any inadvertence or negligence in the party killing :" Held, that the principle announced (Crim. Pr. Act, Sec. 29) related to an entirely different class of cases from that presented by the testimony, and that the charge was clearly erroneous.

CHARGING DIFFERENT WAYS—PRESUMPTION. Where the record in a criminal case shows that the court differently defined the law upon any given subject, one clause being correct and the other erroneous, injury will be presumed to follow, unless it clearly appears that no injury resulted therefrom.

JUSTIFICATION OF HOMICIDE—WHEN "UNAVOIDABLE NECESSITY" REQUIRED. Where in case of a homicide, claimed to have been committed in self-defense, the court charged that "To justify the homicide it must appear there was an unavoidable necessity :" Held, that this was very different from the language of the statute that "Justifiable homicide may also consist in unavoidable necessity" (Crim. Pr. Act, Sec. 29) and a perversion of its sense.

MURDER—PHYSICAL DISABILITY OF ACCUSED. Where in a murder case defendant asked an instruction that "If defendant was, at the time of the alleged homicide, laboring under great physical disability, such as to render him unable to cope with deceased in a fight where weapons were not used, the defendant had a right to use any means in his power to protect himself if attacked :" Held, clearly wrong, as it would give a person when attacked the right to take the life of his assailant, without reference to the fact whether or not the circumstances of the assault were sufficient to excite the fears of a reasonable person that he was in danger of his life or of receiving great bodily harm.

JUSTIFIABLE HOMICIDE — DEFENDANT'S BELIEF OF DANGER. An instruction asked by defendant in a murder case that "If at the time of the homicide defendant had reason to believe, and did believe, that he was in danger of receiving great bodily harm at the hands of deceased, he had a right to defend himself, even to the taking the life of his adversary :" Held, erroneous, in this: that it assumed that defendant was without fault.

WHEN HOMICIDE JUSTIFIABLE—SELF-DEFENSE. In order to justify a homicide, claimed to have been committed in self-defense, it must appear that to defendant's comprehension, as a reasonable man, he was actually in danger of his life or of great bodily harm, and that to avoid such danger it was absolutely necessary for him to take the life of deceased.

State *v.* Ferguson.

CRIMINAL LAW—PRACTICE ON REFUSING INSTRUCTIONS ALREADY GIVEN.   If
    an instruction is refused because its substance has been given, that fact
    should be stated and noted on the instruction.

EVIDENCE—MORAL CERTAINTY.   Moral certainty, as distinguished from math-
    ematical certainty beyond the possibility of a doubt, is all that the law ever
    requires in order to establish a fact beyond a reasonable doubt to the satis-
    faction of a jury.

CRIMINAL LAW—DECLARATIONS OF DEFENDANT—RES GESTÆ.   In a criminal
    case, to make the declarations of defendant admissible evidence in his
    favor, it must appear that they constituted parts of the res gestæ.

IMPEACHMENT OF WITNESS—GENERAL MORAL CHARACTER NOT IN ISSUE.   Upon
    impeachment of a witness, it is his general reputation for truth and verac-
    ity, and not his general moral character, which is in issue.

APPEAL from the District Court of the Seventh Judicial
District, Lincoln County.

The defendant was indicted on July 21, 1873, of the murder
of Robert Ash, alleged to have been committed in Lincoln
County on July 13, 1873.   He was tried in August following;
and, having been convicted of murder in the first degree, and
his motion for a new trial having been overruled, was sen-
tenced to be hanged on October 31, 1873.   He appealed
from the judgment and order.

It appeared from the testimony of J. Farley, a witness for
the prosecution, that Williams, the steward of the hospital
where the homicide occurred, on the day of the homicide
and previous thereto, suspecting that defendant had a knife
or pistol which defendant denied, searched him.   On cross-
examination and referring to this time, defendant asked the
question : "State whether or not you heard defendant at
that time say to Williams—I mean before the search—that
he asked Williams to pay Ash off and let him go or else he
(Ash) would kill somebody, or words of like import."   The
prosecution objected on the ground that it was not cross-
examination, and was irrelevant and immaterial for the
reason that no declaration of the defendant of this character

could be testimony in the case. The court sustained the objection and defendant excepted.

The facts relating to the homicide are stated in the opinion.

*Ellis & King* and *Crittenden Thornton*, for Appellant.

I.   The instruction, asked by defendant, which required the jury to be satisfied beyond a reasonable doubt and to a moral certainty, or in other words entirely satisfied of the guilt of the defendant, contained the law, clearly and concisely stated. *People* v. *Padilla*, 42 Cal. It was not given in substance by the court, nor in any of defendant's instructions which were given. If refused because given in substance in another portion of the charge, such reason should be noted on the instruction. *State* v. *Bonds*, 1 Nev. 35; *People* v. *Williams*, 17 Cal. 147; *People* v. *Lachanais*, 32 Cal. 433.

II.   The court erred in adding to the third and fourth instructions asked by defendant, because the instructions contained the law and the addition added an erroneous qualification.   2 Bishop Crim. Law, Secs. 643, 644; *People* v. *Campbell*, 30 Cal. 312.

III.   The court erred in the use of the following language to the jury: "And to justify the homicide it must appear that there existed an unavoidable necessity without any will or desire, and without inadvertence or negligence in the party killing." This is radically wrong; such never has been the law, and is a perversion of Sec. 29 of the Crimes Act. Stats. 1861, 60, Sec. 29; *People* v. *Campbell*, 30 Cal. 312.

IV.   There was error in the exclusion of the question asked the witness Farley in regard to the remark of the defendant to Williams. It was relevant as a portion of the res gestæ. The court proceeded upon the ground that it was not admissible in any event. The question proposed to

State *v.* Ferguson.

elicit the existing mental condition of the defendant. It was relevant for the same reason that the threats were. As a general rule any declaration contemporaneous with the main fact in issue, explanatory of accompanying circumstances or the then passions, emotions, purposes, sufferings or intents of the speaker, are a part of the res gestæ. The evidence would have established the primary conditions of the law of self-defense; an indisposition to continue the quarrel and a desire to avoid further controversy. 1 Phillips on Evidence, 231; *Insurance Co.* v. *Mosley,* 8 Wall. 103; *Avison* v. *Kinnaird,* 6 East, 188; *Thompson* v. *Trevanion,* Skin. 402; *People* v. *Scoggins,* 37 Cal. 677; *Dukes* v. *The State,* 11 Ind. 566.

V.   The evidence sought to be elicited from various winesses in regard to the moral character of the witness Williams, was improperly excluded. It was well understood by court, witnesses, counsel and jury, that it was only intended to investigate Williams' character for truth and veracity, and not in regard to honesty, venality, virtue or sobriety. An inquiry designed to elicit evidence competent in itself, and understood by court, counsel, witnesses and jury, according to its intended and legitimate effect, should not be excluded by a literal and verbal construction.

*L. A. Buckner,* Attorney General, for Respondent.

I.   The first instruction asked by defendant was properly refused. The jury were to be sure to a moral certainty, not to a mathematical or physical certainty, that the defendant was guilty as charged in the indictment. Criminal Practice Act, Secs. 387, 388.

II.   If there was any error in the third instruction it was against the State. The defendant was bound to prove that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm,

the killing of Ash was absolutely necessary, and not only this but that he did not create the necessity, or if he was originally the assailant, that. he had really in good faith, endeavored to decline any further struggle before the mortal blow was given. Stats. 1861, 60, Sec. 25; 2 Bishop on Criminal Law, 565; 2 Foster, 227; *State* v. *Hill,* 4 Dev. and Bat. 491; *State* v. *Howell,* 9 Ire. 485; 1 Hale P. C. 482.

III.  A bare fear that Ash would do defendant great bodily harm was not sufficient to justify him in killing Ash; the circumstances must appear to have been sufficient to excite the fears of a reasonable person; and in addition that Ferguson acted under the influence of those fears, and not in a spirit of revenge. *Dyson* v. *State,* 26 Miss. 362; *Harrison* v. *State,* 24 Ala. 67; *Dupree* v. *State,* 33 Ala. 380. So it is plain the court did not err in refusing the fourth instruction as asked and in qualifying it.

IV.  The words "and to justify the homicide it must appear that there existed an unavoidable necessity, without any will or desire, and without any inadvertence or negligence in the party killing" were in fact intended to be a separate paragraph and to commence what the court had to say of justifiable homicide, giving its various kinds. So far it was correct. Suppose it had been given in an independent instruction, would it not have been abstractly correct? Now this is just what the court did say, but awkwardly expressed.

V.  The question asked Farley was properly ruled out. What defendant said to Williams was not a part of the res gestæ. The evidence would not have shown or tended to show that Ash was the assailant. All that was claimed was that there was a mutual combat and so defendant put himself without the pale of the law of self-defense.

VI.  It seems to be admitted that the evidence sought, in relation to the character of Williams, was his character

for truth and veracity. It is plain that general moral character would have been irrelevant; and the questions were therefore properly excluded.

By the Court, HAWLEY, J. :

The defendant was convicted of murder in the first degree. The court below refused to grant him a new trial; hence this appeal.

Defendant admitted the homicide and claimed that it was justifiable. The fight occurred on the 13th of July. Ash (deceased) was an Englishman and an Orangeman. Ferguson (defendant) was an Irishman and a Roman Catholic. Both were inmates of the county hospital; Ash as a cook, Ferguson as a patient. Both were under medical treatment. Dr. Deal, the county physician, testified that "they were both sick men," and that he had "no means of judging which was the superior in physical strength." Ash was suffering from disease of the veins of the right leg, but was attending to his duties as a cook. Ferguson, owing to a deformity in his left arm and leg, was unable to perform such duties. His general health was good and he had been informed that he would not receive any more medical treatment. Harsh words had passed between them during the day relative to their respective places of nativity and religious belief. Each had applied to the other offensive, abusive and vulgar epithets, well calculated to provoke a fight. Ash was frequently importuning Williams, the steward, for his pay. He said that he "wanted to have something to travel on" and "to be placed in such a position so that he could lick three or four Irish," etc. Ferguson said to Williams, "for mercy's sake pay that man off or he will kill somebody, or do some harm, or get himself hurt." About 5 o'clock in the afternoon the witness Farley heard "Ash and defendant scolding and calling each other names." After bandying epithets for

some time, Ash said "that he could whip defendant," and the defendant told him "to pitch in." Ferguson at this time was in his bed-room and Ash was in the hall.

The testimony is conflicting. Williams was a witness for the State and, in his testimony relative to the beginning of the fight, said : "They both met at the door; both of them clinched, and both of them struck each other." Hunt, a witness for the defense, testified that Williams caught " Ferguson by the arm and said 'get out of here and fight on the outside;' he gave him a jerk by the arm at the time he stepped from between them. Ash hit Mr. Ferguson over the left eye, and almost simultaneously Mr. Ferguson struck Ash. * * * I could discriminate a little difference between the blows. In the meantime Mr. Ferguson could not get out of the hall. * * Ash held Ferguson by the throat." From the testimony of defendant, who was a witness in his own behalf, it appears that Ash had said to him : "If I get my hands on you, I won't leave a bone in your body that I won't break. I will fix you. I will break your game leg for you." After giving a very minute and lengthy statement in regard to the conduct of Ash on the day of the homicide, defendant testified as follows : " He called me all the abusive language in the world, * * I stepped up and caught hold of the door to pull it to me so as not to listen to him; * * * then Scotty (Williams) gave me a pull and landed me into the hall; then Ash gave me a blow * * over the right eye. He shoved me right along until I came to * * the corner. Before this I gave him a punch and knocked him down, * * backed away from him * * * ; he got me by the throat and gave it to me pretty well * * * ; therefore I was forced to exert myself to save my life." During the fight some fifteen or twenty wounds were inflicted upon the person of the deceased. The weapon used by defendant was a dissecting knife, the property of Williams.

In view of this testimony, we are of opinion that the cour

in its charge to the jury so mutilated one section of the statute as to entirely deprive defendant of his plea of self-defense. It is quite evident that the court failed in discriminating what sections of the statute were relevant.

1.   After charging the jury as follows: "If you believe from the evidence that the defendant procured a knife with a premeditated intention to engage in a fight with the deceased with the intention of doing great bodily harm, then the killing would be murder; but if you believe that the defendant had no malice aforethought towards the deceased at the time of the homicide, but used the knife in the heat of passion and not in necessary self-defense of life or great bodily harm, then the offense can only amount to manslaughter;" the court adds: "*And to justify the homicide it must appear that there existed an unavoidable necessity, without any will or desire and without any inadvertence or negligence in the party killing.*"

Why this clause relative to justifiable homicide was inserted, or what it means in this connection, is beyond comprehension. It is a clear perversion of the sense of the section of the statute from which it is partly copied. Stats. 1861, 60, Sec. 29. This section relates to an entirely different class of cases from that presented by the testimony, and hence its provisions should not have been embodied in any form in the charge of the court. The attorney general admits that the court made a mistake in inserting any portion of section 29, in the connection where used; but contends that it could not have prejudiced defendant because it was not relevant to the issues presented, and for the further reason that the court in another portion of the charge gave the proper statutory definition of justifiable homicide by copying the first sentence of section 25, and all of sections 26 and 27 of the "act concerning crimes and punishments." Stats. 1861, 60. This position cannot be maintained.

The principle of law is well settled that where the record in a criminal case shows that the court differently defined the law upon any given subject—one clause being correct, another erroneous—that injury must be presumed to follow from such a state of facts, unless the record clearly shows that no injury resulted therefrom. *People* v. *Campbell*, 30 Cal. 312; *Holmes* v. *State*, 23 Ala. 23; *Logue* v. *Commonwealth*, 38 Penn. State, 269. It is impossible for this Court to determine which clause of the charge the jury acted upon or what effect the erroneous one had upon the deliberations of the jury. It may be that the jury detected at once the utter absurdity of the erroneous part of the charge and entirely disregarded it in finding their verdict. But when we consider that it was the duty of the jurors to take the law from the court and that this duty was specially pointed out in the court's charge, as follows: "It is your duty to be governed by the law as given you by the court, regardless of anything to the contrary that may have been said to you by counsel on either side," the natural presumption becomes conclusive that the jury did consider the erroneous clause; and, for aught we know, it may have controlled their verdict. The law does not conclude the rights of individuals or parties upon any such uncertain grounds. Its utmost effort is accuracy, as far as it may be attained through fallible agencies, and then its mission is complete and its conclusions irrevocable.

It is not necessary to consider whether it would have been such an error as to mislead the jury to the prejudice of defendant, if the court had correctly copied section 29 as an independent instruction and in the order where it is found in the statute. There is a marked difference in the language of the statute, that "justifiable homicide may also consist in unavoidable necessity," from that used by the court, "and to justify the homicide it must appear that there was an unavoidable necessity." By this change in the phraseology,

the whole sense of the statutory provision is perverted.
This portion of the charge is palpably inapplicable and
erroneous.

2.  The third and fourth instructions as asked by counsel
for defendant, read as follows: "Third—If the jury believe
from the testimony that defendant was at the time of the
alleged homicide laboring under great physical disability
such as to render him unable to cope with deceased in a
fight where weapons were not used, the defendant had a
right to use any means in his power to protect himself if
attacked." "Fourth—If the jury believe from the testi-
mony that defendant at the time he committed the homicide
had reason to believe, and did believe, that he was in danger
of receiving great bodily harm at the hands of deceased,
then he had a right to defend himself even to the taking the
life of his adversary." To each of which the court added:
"But it must appear that the killing of deceased was abso-
lutely necessary, and it must appear also that the person
killed was the assailant or that the slayer had really and in
good faith endeavored to decline any further struggle before
the mortal blow was given," and marked on each instruction
" Given in connection."

Neither of the instructions was correct. The court had
the right either to refuse them, or add thereto such quali-
fications as were necessary to state the law correctly. The
principle as announced in the third instruction was clearly
wrong. It would give to a defendant when attacked the
right to take the life of his assailant in all cases where he
is laboring under such physical disability as to render him
unable to cope with his assailant, without any reference to
the vital and controlling fact, whether or not the circum-
stances of the assault were sufficient to excite the fears of a
reasonable person that he was in danger of his life or of
receiving great bodily harm. The fourth instruction was

erroneous, in this: that it assumed that defendant was without fault.

If Ferguson was in the wrong, the killing of Ash would not be justifiable; but the offense would be either murder in the first or second degree, or manslaughter, as the evidence might justify. The addition made by the court to each of these instructions was, in our judgment, calculated more to confuse than to enlighten the jury. It is undoubtedly true that it must appear that the killing of deceased was absolutely necessary, "But," as was said by Rhodes, J., in *People* v. *Campbell*, 30 Cal. 315, "it is not necessary under the statutory rules * * * that the jury shall find that the killing was absolutely necessary beyond the possibility of a doubt; for that could be made to appear only upon the infliction of the injury by the assailant, which the person assailed is permitted to protect himself against by killing the assailant."

In order to justify the homicide it must appear to the defendant's comprehension as a reasonable man that he was actually in danger of his life, or of receiving great bodily harm; and that to avoid such danger it was absolutely necessary for him to take the life of the deceased. "The inquiry" as was said by Cole, J., in *State* v. *Collins*, 32 Iowa, 39, "is not whether the harm apprehended was actually intended by the assailant; but was it actual and real to the accused as a reasonable man as compared with danger remote or contingent."

By the frequent use of the words "absolutely necessary," as found in the instructions and charge, the jurors may have drawn the inference that before they would be justified in acquitting the defendant it must appear to *them* that the killing of deceased was absolutely necessary. This view of the case would virtually deprive a defendant of a reasonable exercise of his own judgment in determining from all the circumstances what was necessary to be done for the protec-

tion of his person or his life—a right which the law confers upon every individual ; but one that must always be exercised at his peril, subject to revision by a jury of his peers. Bishop states the rule as follows : " Whenever a man exercises his right of self-defense, he must be understood to act on facts as they appear to him. And if, without fault or carelessness, he is misled concerning them and defends him-self correctly according to what he supposes the facts to be he is justifiable, though they are in truth otherwise, and he has really no occasion for the extreme measure." 1 Bishop on Crim. Law, Sec. 384.

This principle was announced by Judge Parker, afterwards Chief Justice of Massachusetts, in Selfridge's Case; endorsed by the supreme court of New York in *People* v. *Shorter*, 4 Barb. 477 ; affirmed in the court of appeals, *Shorter* v. *People*, 2 Comstock, 197, and is sustained by the weight of reason and a decided preponderance of the authorities. *Oliver* v. *State*, 17 Ala. 599 ; *State* v. *Harris*, 1 Jones (N. C.), 193 ; *State* v. *Sloan*, 47 Mo. 604 ; *Meredith* v. *Commonwealth*, 18, B. Monroe, 49 ; *Logue* v. *Commonwealth*, 38 Penn. 267; *Campbell* v. *People*, 16 Ills. 19 ; *Pond* v. *People*, 8 Mich. 150.

This being the law, it follows that if Ferguson was without fault and had reasonable ground to believe, and did believe, that he was in danger of his life or of receiving great bodily harm from Ash, and that this could only be prevented by his using such means of defense as were within his power, and he acted under such belief and not in a spirit of revenge, then the killing of Ash was justifiable. Whether there was an absolute necessity for a resort to such means was a question for him to decide at the time ; and, although he may have erred in his judgment as to the existence of such necessity, still if from all the attending facts and circumstances he in good faith believed, and had reasonable grounds for believing, that his only safety was in using the means then in his power to prevent Ash from killing him or inflicting

great bodily harm, the use of such means was justifiable. Whether from the testimony such a state of facts existed was a question for the jury to determine.

3.   It is claimed that the court erred in refusing this instruction: "The jury must be satisfied beyond a reasonable doubt and to a moral certainty or, in other words, entirely satisfied of the guilt of defendant, or they should acquit." All men do not express their ideas in the same language, nor give to all words the same meaning; hence it is usual for courts to give instructions in the language employed by counsel, whenever the same contain correct principles of law and are not calculated to mislead the jury. If an instruction is refused because its substance has been given by the court, that fact should be stated and noted on the instruction, otherwise it might be such an error as to deprive the defendant of a substantial right. *People* v. *Bonds*, 1 Nev. 35; *People* v. *Williams*, 17 Cal. 147; *People* v. *Lachanais*, 32 Cal. 433.

The last sentence, in the instruction under review, was evidently intended by counsel as explanatory of the first. If the jurors were "satisfied beyond a reasonable doubt, and to a moral certainty," they must have been *entirely satisfied;* and taken in this sense the addition of the latter sentence was, as we think, a useless repetition, surplusage, but not erroneous. The court, having in its charge copied the language of C. J. Shaw in *Comwonwealth* v. *Webster*, 5 Cush. 320, in regard to reasonable doubt, should have noted on this instruction that it was refused because it had in substance been correctly given by the court. The words "entirely satisfactory" may be so used as to convey the idea that the jury must be satisfied to a mathematical certainty, beyond the possibility of a doubt, and when so used should always be rejected by the court.

Moral certainty is all that the law ever requires in order to establish any fact beyond a reasonable doubt to the satis-

faction of a jury. Infallibility belongs not to men, and even their strongest degree of moral assurance must be often accompanied by the possible danger of a mistake; but, after just effect has been given to sound practical rules of evidence, there will remain no other source of uncertainty or fallacy than that general liability to error which is necessarily incidental to all investigations founded upon moral evidence, and from which no conclusion of the human judgment in relation to questions of contingent truth can be absolutely and entirely exempt. "In the ordinary affairs of life," says Greenleaf, "we do not require demonstrative evidence, because it is not consistent with the nature of the subject, and to insist upon it would be unreasonable and absurd." Starkie, after a careful review of this subject, lays down the rule as follows: " What circumstances will amount to proof can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury: * * * absolute, metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt." 1 Starkie Ev. Sec. 514; *Sumner* v. *State,* 5 Blackford, 582; *Giles* v. *State,* 6 Georgia, 286; *McCann* v. *State,* 13 Miss. 489. It certainly will not be contended that any higher degree of proof is necessary where, as in the present case, the testimony is direct.

4. The objections of counsel relating to the admissibility of certain testimony may be summarily disposed of. To make the declarations of defendant admissible it must appear that they constituted parts of the *res gestœ.* "To have become such," says Hosmer, C. J., in *Enos* v. *Tuttle* (3 Conn. 250,) "they must have been made at the time of the act done, which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize

with them as obviously to constitute one transaction." 1 Greenleaf on Ev. Sec. 108, and authorities there cited; *State v. Ah Loi*, 5 Nev. 100.

5. It was the reputation of Williams for truth and veracity, not his general moral character, that was in issue; and counsel should have confined themselves to that question. To be a competent witness the person testifying must be acquainted with the general reputation of the witness sought to be impeached in the community where such witness resides.

The judgment of the district court is reversed and the cause remanded for a new trial.

WHITMAN, C. J., did not participate in the foregoing decision.

